IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH PRASNIKAR,** | : | **Civil No. 3:13-CV-743** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

This is an action brought by Joseph Prasnikar ("Prasnikar" or "the plaintiff"),

a claimant for supplemental social security income (SSI) benefits under Title XVI of

the Social Security Act (Act), 42 U.S.C. §§ 1381-1383f.  An administrative law judge

(ALJ) presided over a hearing on Prasnikar's claims, and reviewed Prasnikar's

medical and opinion evidence offered in support of his application for benefits.

Following that review, the ALJ issued an adverse decision, finding that Prasnikar was

not totally disabled as a result of a combination of physical and mental limitations,

and, therefore, denied his claim for SSI benefits.   In this action, Prasnikar seeks

review of this decision pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).  Because we

find that the ALJ's decision was supported by substantial evidence, and because there is no basis to remand this decision for further consideration, Prasnikar's claims will be denied.

## II.   STATEMENT OF THE CASE

The plaintiff sought disability benefits in 2011 after having had little work experience as an adult, due in large part to the fact that he was incarcerated for much of his adult life.  Prasnikar spent 16 years, between 1988 and 2004, incarcerated in Massachusetts as the result of an undisclosed sexual crime.  (Doc. 8, Transcript and Exhibits ("Tr.") 1089.)  Since his release from custody, it appears that Prasnikar has lived in or around Tuscarora, Pennsylvania, where he has held two jobs, working briefly as a telemarketer between 2006-2007, and as a laborer with a temporary employment service between 2004 and December 2009.

In October 2009, Prasnikar suffered a heart attack while working as a temporary worker at a turkey farm, and was life-flighted to Lehigh Valley Hospital, where he was diagnosed with a non-ST elevation myocardial infarction, coronary artery disease status post drug-eluting stent to the right coronary, pneumonia, tobacco use, hypertension and hyperlipidemia.  Prasnikar was discharged on October 8, 2009, in stable condition, with multiple discharge medications, and without recurring chest pain or arrhythmia, after doctors "had a long discussion" with him regarding the need

for him to stop smoking and the health risks associated with living with a roommate who smokes cigarettes.[1]  (Tr. 223.)  Prasnikar continued to smoke immediately after he was discharged, was readmitted to the hospital on October 8, 2009, after experiencing chest pain, and was catheterized.  On October 10, 2009, he reported himself to be pain-free and asymptomatic and was deemed stable for discharge.  (Tr. 255.)

After the heart attack, Prasnikar returned to his job at the turkey farm, but found he could no longer perform his prior work there as a turkey handler, and was unable even to perform lighter duty tasks such as folding boxes, notwithstanding that he was taking tablets of nitroglycerin on average twice a week to help him cope with chest pain, ventricular contractions and burning sensations that he claims to have experienced four to five times a week.[2]

Believing that he was no longer capable of engaging in any substantial gainful employment, Prasnikar protectively filed an application for SSI benefits on March 22,

---

[1]  By the time of his hearing before the ALJ, Prasnikar had not stopped smoking, although he represented that he was down to five cigarettes a day and had been put on Chantix to aid his effort at smoking cessation.

[2]  Prasnikar's asserted inability to continue working in a lighter capacity as a box maker at the turkey farm appears to have been based on his claim that he suffers from carpal tunnel syndrome.  Prasnikar has not supported this claim with medical evidence, and in fact has not claimed that he is disabled because of this alleged condition.

2010, alleging a disability onset date of October 6, 2009, the day of his heart attack. A hearing was held on June 24, 2010, in Pottsville, Pennsylvania before the Honorable Michelle Wolfe, an administrative law judge.   During the hearing, Prasnikar testified, as did his girlfriend, Hallie Gerber, and Gerald Keating, an impartial vocational expert.   On August 17, 2011, the ALJ issued an unfavorable decision denying Prasnikar's claims for SSI benefits.  (Tr. 61-78.)

Prasnikar was 43 years old at the time of the ALJ's adverse decision, and, therefore, considered a "younger individual" under Social Security Regulations (Tr. 16).  20 C.F.R. § 416.963(c).   He has a GED, and can speak, understand, read, and write English.  (Tr. 18, 165.)   Prasnikar lives in an apartment with his girlfriend, Hallie Gerber, a woman sometimes identified in the record documents as Prasnikar's fiance. (Tr. 17.)  In this action, Prasnikar claims that he is totally disabled based upon heart disease, chronic obstructive pulmonary disorder (COPD), depression, and post-traumatic stress disorder (PTSD) relating to his long-term incarceration.   (Tr. 36, 166.)   In addition to these asserted impairments, Prasnikar claims that he sleeps poorly, suffers from back pain, has volatile moods, is frequently defensive and aggressive, and experiences violent dreams about prison that sometimes result in him unconsciously lashing out at his girlfriend in the middle of the night.

4

On January 15, 2010, after he had discontinued working at the turkey farm, Prasnikar had a follow-up medical appointment to assess his heart condition. A radiology report produced at that time showed that he had no active cardiovascular disease in his chest, his lungs were found to be clear, and his heart was a normal size. (Tr. 286.)

On March 12, 2010, Prasnikar again sought treatment for chest pain and chronic asthma; the doctor who saw him was Carolyn Houk, M.D. (Tr. 561.) During this medical appointment, it was noted that the plaintiff had not followed up on his medical appointments for several months, yet was now requesting that the doctor help him obtain disability benefits. (Tr. 562.) The nursing intake notes indicate that the plaintiff was claiming to have daily aching chest pain provoked by stress, and claimed that he felt chronically fatigued and demoralized that he could no longer work.

During his exam, Prasnikar was found to be alert, healthy, and in no distress, though it was difficult to get a good lung exam because he would not or could not comply with directions to take deep breaths. (Tr. 564.) The plaintiff's heart rate and rhythm were normal with no unusual sounds like clicks, murmurs, rubs or gallops. (Tr. 564.) In her notes from the appointment, Dr. Houk observed that "[d]espite him feeling chest pain, sob and fatigue, he has not sought medical attention within the last 5 months and is instead asking for disability which is odd." (Tr. 564.) Dr. Houk

could not do a complete assessment for a variety of reasons, and after noting that the plaintiff needed to improve medically before further assessment was possible, she stated that "I cannot rule out depression." (Tr. 564.)  Dr. Houk also noted that the plaintiff was noncompliant with his medications and continued to smoke, something she "strongly urged" him to stop doing given his asthma and its effect upon his health.  (Tr. 564.)[3]

Dr. Houk saw the plaintiff again on March 29, 2010.  During this visit, his heart rate and rhythm were once again found to be regular with no unusual sounds. (Tr. 1095.)  During this visit, the plaintiff exhibited some bilateral wheezing in his lungs, but it was noted that he had a better airway than was previously observed.  (Tr. 1095.) Dr. Houk's notes indicate that cardiologists did not believe that the plaintiff's chest pain was related to active ischemia, and he had a normal ejection fraction, which is a measurement of the percentage of blood leaving the heart after it contracts. (Tr. 1096.)  It was also noted that the plaintiff continued to smoke, despite being

---

[3] Records from around this time indicate that the plaintiff had appeared at St. Luke's Hospital in Coaldale, Pennsylvania, complaining of shortness of breath and other related conditions, and appeared to be suffering from pneumonia, though it appeared that his condition was found to be normal.  (Tr. 507-510.)  It was also observed that the plaintiff suffered from some nasal blockage, with a deviated septum, which may have been the result of fights that the plaintiff had as an inmate.  (Tr. 517.)

strongly advised to quit, and that his asthma had not improved since his last visit. (Tr. 1096.)

On May 5, 2010, the plaintiff was seen by Larry Jacobs, M.D. for complaints of chest pain. (Tr. 582.) Dr. Jacobs noted that the plaintiff's chest pain was atypical, and that his heart rhythm was regular with no unusual sounds. (Tr. 583.) Dr. Jacobs found that most of the plaintiff's symptoms, which included shortness of breath, were related to or due to his COPD. (Tr. 583.) Like Dr. Houk, Dr. Jacobs recommended that the plaintiff quit smoking. (Tr. 583.)

On May 24, 2010, the plaintiff underwent cardiac stress testing and was found to have a normal resting electrocardiogram (ECG), with no abnormal changes when exercising. (Tr. 960.) During this examination, the plaintiff exhibited normal ventricular function and normal myocardial contractions at rest and during periods of exercise. (Tr. 960.) When at his maximum exercise level, the plaintiff reported experiencing some mild chest pain. (Tr. 960.)

Two days later, the plaintiff was again seen by Dr. Houk. At this appointment, the plaintiff's heart rate was found to be regular and exhibited no unusual sounds. (Tr. 1113.) The plaintiff did still have some slight wheezing in his lungs, but it was noted that this had improved since his prior visit. (Tr. 1113.) Dr. Houk again emphasized the need for the plaintiff to stop smoking, and told him that his asthma

would not improve unless he did so.  (Tr. 1113.)  At this visit, Dr. Houk noted that the plaintiff was seeing a physical therapist for a lumbar disc displacement issue.  (Tr. 1114.)  Dr. Houk made similar notes during follow-up appointments in the coming months.  (Tr. 1124, 1133, 1135-36, 1150,1152.)

On June 24 2010, Candelaria Legaspi, M.D., conducted a physical residual functional capacity (RFC) assessment of the plaintiff based upon her review of his health records.  (Tr. 658.)  She concluded that the plaintiff could occasionally lift or carry 20 pounds and frequent lift or carry ten pounds.  (Tr. 658.)  She found that he had no limitation on his ability to push or pull, and that he had the ability to stand, walk or sit for six hours during an eight-hour workday.  (Tr. 658.)  The plaintiff was found to have no postural, manipulative, visual, communicative or environmental limitations.  (Tr. 659-60.)  As part of her assessment, Dr. Legaspi found that the medical evidence indicated that the plaintiff had coronary artery disease, COPD, back pain, and a disc bulge at L4-L5.  (Tr. 662.)   With respect to the plaintiff's heart condition, Dr. Legaspi found that the plaintiff experienced no episodes of angina or congestive heart failure, his ejection fracture of 60% was normal, and he had not sought or undergone aggressive pain treatments for his back symptoms.  (Tr. 662.)  Based on her review of the plaintiff's records, and finding that the plaintiff had been

able to control his pain symptoms, Dr. Legaspi concluded that the plaintiff was capable of engaging in light work. (Tr. 663.)

In October 2010, the plaintiff again presented at Lehigh Valley Hospital with complaints of chest pain. (Tr. 964.) During that visit, the plaintiff had x-rays taken that showed that he had no acute cardiopulmonary disease, and his heart rate and rhythm were normal. (Tr. 973, 977.) An ECG was negative for ischemia. (Tr. 979.) During a follow-up appointment, the plaintiff told medical providers that his COPD symptoms were controlled. (Tr. 993.) An x-ray taken in late October 2010 showed that the plaintiff's heart was normal. (Tr. 1196.) The following spring, in March 2011, a radiology report showed that the plaintiff had no active heart disease, and exhibited no signs of respiratory distress. (Tr. 1067, 1073.) Nevertheless, despite these apparently neutral or positive findings throughout the fall of 2010 and spring of 2011, in April 2011, Dr. Houk opined in a Pennsylvania Department of Welfare form that the plaintiff was permanently disabled as a result of coronary artery disease, COPD and hyperlipidemia. (Tr. 1082.)

In addition to his alleged physical limitations, Prasnikar has also experienced certain mental impairments or challenges. Thus, on April 8, 2010, the plaintiff underwent a mental status examination in which he was diagnosed with adjustment disorder and depressive disorder, and was assigned a Global Assessment of

9

Functioning (GAF) score of 45, suggesting a serious impairment.[4]  (Tr. 647-48.)  At the time of this assessment, the plaintiff appeared anxious and depressed, but was neat, with good hygiene, made good eye contact, and demonstrated logical and coherent thinking.  (Tr. 646.)

On June 4, 2010, Peter Garito, Ph.D., conducted a mental RFC assessment based upon his review of the plaintiff's health records.  (Tr. 623.)  Following his review, Dr. Garito opined that the plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, and

---

[4]  The GAF scale is a measure of the psychological, social, and occupational function on a hypothetical continuum of mental health.  Am. Psych. Ass'n Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994).  The scale ranges from 0 to 100, with serious impairment of functioning at a score of 50 or below, moderate difficulty in functioning at 60 or below, and some mild functioning difficulty at 70 and below.  Id. at 34.

Although we initially were given some pause in considering the plaintiff's claims and the ALJ's decision given that the plaintiff received two low GAF scores from mental health professionals, we note that the plaintiff has not challenged the ALJ's treatment of this particular aspect of the record.  Moreover, we are mindful that Courts within the Third Circuit have accepted the Commissioner's position that GAF scores are not dispositive of disability. See, e.g., Gilroy v. Astrue, 351 F. App'x 714, 716 (3d Cir. 2009) (explaining that a GAF score of 45 did not warrant remand given that no statement of specific functional limitations accompanied the score); Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).  Given the absence of argument on this particular issue, and since the ALJ's evaluation of the evidence and determination of the plaintiff's RFC otherwise finds substantial support in the record, we do not find that remand is warranted for further consideration of this particular aspect of the record.

maintain attention and concentration for extended periods.  (Tr. 623.)  Dr. Garito

further opined that the plaintiff was moderately limited in his ability to interact

appropriately with members of the general public, to get along with co-workers or

peers without distracting them or even exhibiting behavioral extremes, and to respond

appropriately to changes in the work environment.  (Tr. 624.)  Dr. Garito concluded

that the evidence demonstrated medically determinable impairments of depression,

adjustment disorder, and PTSD.  (Tr. 625.)  Nevertheless, Dr. Garito also found that

the plaintiff had the ability to engage in most activities of daily living, including

driving, making meals, shopping and managing finances.  (Tr. 625.)  Dr. Garito found

that there were limits in the plaintiff's social activity, but that he was able to relate to

family members and others with whom he interacted.  (Tr. 625.)  Based on his

observations, Dr. Garito found that the plaintiff was capable of making simple

decisions, carrying out short and simple instructions, maintaining regular attendance,

and performing simple and routine tasks in a job setting.  (Tr. 625.)  Likewise, Dr.

Garito concluded that the plaintiff was able to satisfy the basic mental requirements

of competitive work on a sustained basis, notwithstanding his limitations.  (Tr. 625.)

In addition to his RFC assessment, Dr. Garito completed a form psychiatric review

in which he concluded that the plaintiff had only mild limitations on his activities of

daily living and moderate difficulty in maintaining social functioning and concentration, persistence and pace. (Tr. 637.)

On September 14, 2010, the plaintiff was examined by Jopindar Pal Harika, M.D., a psychiatrist. (Tr. 1089.) During this examination, Dr. Harika noted that the plaintiff was cooperative, maintained fair eye contact, was alert, coherent, logical, and goal-directed in his speech. The plaintiff's thought processes were found to be organized, and his reality contact was adjudged to be fair. (Tr. 1090.) Dr. Harika found the plaintiff had normal intellect, and had fair insight and judgment. (Tr. 1090.) The plaintiff reported that he was depressed and had limited interest in activities, and exhibited psychomotor retardation. (Tr. 1090.) Additionally, the plaintiff told Dr. Harika that he experienced anxiety and flashbacks relating to past abuse. (Tr. 1090.) Dr. Harika gave the plaintiff a guarded prognosis and assessed a GAF score of 40. (Tr. 1090.)

The ALJ considered the foregoing medical and mental health information, as well as the limited testimony presented by the plaintiff, his girlfriend, and the vocational expert during the administrative hearing. Following consideration of that evidence and opinions, the ALJ determined that the plaintiff had the residual functional capacity to perform a range of light work, with certain non-exertional limitations. (Tr. 68.) In her decision, the ALJ found that the plaintiff needed to avoid

concentrated exposure to temperature extremes, fumes, odors, dusts, gases, humidity, and wetness. (Tr. 68.) Additionally, considering the evidence regarding the plaintiff's limited ability in social settings, the ALJ found that the plaintiff would be limited to engaging in routine, simple tasks in a low-stress environment defined to involve only occasional decision making, and occasional changes in work setting. (Tr. 68.) Additionally, the ALJ limited the plaintiff to jobs that would require only occasional interaction with the public and co-workers. (Tr. 68.)

Based upon this RFC, the ALJ asked the testifying neutral vocational expert (VE) whether a person of the plaintiff's age, and with the same education, work experience and RFC could perform work in the national economy. The VE testified that such a person could perform jobs such as a pricer, an operator or assembler, and a packer. (Tr. 54.) Finding that the plaintiff had an RFC that would allow him to engage in substantial gainful employment in a range of jobs that existed within the national economy, the ALJ found that although the plaintiff had severe impairments from coronary artery disease, COPD, adjustment disorder, and depressive disorder, he was not totally disabled as a result of these impairments, and denied his request for SSI benefits.

In this action, the plaintiff assigns five points of error to the ALJ's decision. First, he argues that the ALJ did not properly evaluate his credibility or his subjective

complaints with respect to the intensity, persistence, and limiting effects of his alleged physical symptoms. Additionally, the plaintiff claims that the ALJ did not adequately consider the opinions of his treating physicians, his prior work record, his testimony regarding his daily activities, and the precipitating and aggravating factors that he identified in support of his claim. (Doc. 9, Pl. Br. at 3-7.)

Second, the plaintiff claims that the ALJ erred by failing to give an adequate rationale when she rejected the treating and examining source opinions, and by failing to give proper consideration of the treating and examining source opinions in accordance with applicable regulations and Social Security rulings. As will be discussed below, the plaintiff's argument appears to be limited to an argument that the ALJ failed to consider the treatment summary provided by a licensed social worker, who does not qualify as an acceptable medical source under applicable regulations.

Third, the plaintiff claims that the ALJ erred by finding that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the one of the listed impairments set forth in 20 C.F.R. §§ 416.927, 416.925, and 416.926.

Fourth, the plaintiff argues that the ALJ's decision should be set aside because she failed to take into consideration the type, dosage, effectiveness and side effects

of medication that he was taking, "as well as treatments other than medication." (Doc. 9 at 3.) The plaintiff does little, however, to explain how the ALJ's assessment of these factors fell short of what was required in this setting. Moreover, the ALJ did consider the plaintiff's medical regimen, and thus this claim appears factually inaccurate.

Finally, the plaintiff claims that the ALJ erred in finding that the plaintiff could perform jobs which were identified by an impartial VE, "and failed to describe what full range of functional activities the plaintiff could perform as provided in her hypotheticals to the impartial vocational expert . . . ." (Id. at 4.) In this particular claim, the plaintiff is objecting to the ALJ's RFC assessment, something that we find was adequately supported by substantial evidence.

We will address each of these arguments seriatim below after a review of the guiding legal standards in this field.

## III.   DISCUSSION

### A.   Standards of Review–The Roles of the Administrative Law Judge and This Court

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the administrative law judge and this Court. At the outset, it is the responsibility of the ALJ in the first instance

to determine whether a claimant has met the statutory prerequisites for entitlement to

benefits.   To receive disability benefits, a claimant must present evidence which

demonstrates that he has an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."   42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In making this determination the ALJ employs a five-step evaluation process

to determine if a person is eligible for disability benefits.  20 C.F.R. § 404.1520.  See

also Plummer  v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  If the ALJ finds that a

plaintiff is disabled or not disabled at any point in the sequence, review does not

proceed any further.  20 C.F.R. § 404.1520.  As part of this analysis the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;  (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. § 404.1520.  This disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he is unable to engage in past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

Moreover, where a disability determination turns on an assessment of the level of a claimant's pain, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529. Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  Cases involving an assessment of subjective reports of pain "obviously require[ ]" the ALJ "to determine the extent

to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id.

In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's pain. Instead. at the outset, by statute the ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence. . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory

findings.  20 C.F.R. § 404.1529(a)-(c).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  20 C.F.R. § 404.1529(a)-(c).  In so doing, the medical evidence of record is considered along with the claimant's statements.  20 C.F.R. § 404.1529(a)-(c).  Social Security Ruling 96-7p gives the following instructions in evaluating  the credibility of the claimant's statements regarding his symptoms:  "In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p. SSR 96-4p provides that "Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence

19

in the case record, in evaluating the functionally limiting effects of the impairment(s)." SSR 96-4p.

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Com. of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

Once the ALJ has made a disability determination, it is then the responsibility of this Court to independently review that finding. In undertaking this task, this Court applies a specific, well-settled and carefully articulated standard of review. In an action under 42 U.S.C. § 405(g) to review the decision of the Commissioner of Social Security denying plaintiff's claim for disability benefits, Congress has specifically provided that the "findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §

405(g).

The "substantial evidence" standard of review prescribed by statute is a

deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

When reviewing the denial of disability benefits, we must simply determine whether

the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211,

1213 (3d Cir. 1988); see also Johnson v. Commissioner of Social Sec., 529 F.3d 198,

200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion. Hartranft v. Apfel, 181 F.3d 358, 360 (3d

Cir. 1999)." Johnson, 529 F.3d at 200. See also Pierce v. Underwood, 487 U.S. 552

(1988). It is less than a preponderance of the evidence but more than a mere scintilla

of proof. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence

means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)(quoting

Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).

A single piece of evidence is not substantial evidence if the ALJ ignores

countervailing evidence or fails to resolve a conflict created by the evidence. Mason

v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). However, in an adequately developed

factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). Moreover, in conducting this review we are cautioned that "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir.1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." Frazier v. Apfel, No. 99-715, 2000 WL 288246, *9 (E.D. Pa. March 7, 2000). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

Mindful of the foregoing well-established guidelines, we consider each of the plaintiff's claims of error with respect to the ALJ's decision to deny SSI benefits.

## B.     The ALJ Properly Evaluated the Plaintiff's Credibility

The plaintiff first argues that the ALJ failed to adequately evaluate his credibility in conjunction with the available medical evidence in the record. However, in advancing this argument the plaintiff largely resorts to expressing disagreement with the ALJ's actual assessment of the evidence, and urges this Court to weigh that evidence differently than the ALJ did in order to embrace the plaintiff's claims. Moreover, we agree with the Commissioner that the plaintiff is, in part, attempting to rely on medical records and evidence that substantially predate the relevant period in this case in order to burnish his claims. In contrast, the ALJ expressed myriad reasons to support her finding that the plaintiff's subjective complaints were only partially credible, and her decision is supported by substantial evidence in the record.

As the fact finder, the ALJ has an obligation to weigh all the facts and evidence of record and may accept or reject evidence if she explains her reasons for doing so. Plummer, 186 F.3d at 429. "This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments." Natale v. Comm'r of Soc. Sec., 651 F. Supp. 2d 434, 448 (W.D. Pa. 2009) (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)); see also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Moreover, where the findings

of the Commissioner are supported by substantial evidence, a reviewing court is bound by those findings, even if the court would have decided a particular issue differently. <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001).

The Social Security Administration's regulations and rulings provide further guidance in this field. An ALJ is obligated to assess the credibility of a claimant's subjective complaints about the extent of his functional limitations in the context of the objective medical evidence of record and other factors, including the claimant's treatment history, medications, work history, and daily activities. 20 C.F.R. § 416.929(c); SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).

In this case, the ALJ evaluated the plaintiff's subjective complaints regarding the limitations he claims to experience as a result of his medical conditions, and she did not fully credit the plaintiff's allegations. Importantly for our purposes, the ALJ articulated a number of reasons to support her conclusion, and her explanation in this regard makes clear that her decision was supported by substantial evidence of record.

At the outset, the ALJ pointed out that despite repeatedly being warned by multiple doctors about the dangers of smoking cigarettes, and the importance of quitting given its deleterious effect on his medical condition, the plaintiff continued to do so – indeed, the evidence indicates that he immediately resumed smoking after being discharged from the hospital in October 2009 after suffering a heart attack. (Tr.

24

70, 223, 562, 583, 1096, 1113.)   The ALJ found that the plaintiff's breathing difficulties were somewhat less severe than he suggested, pointing out that the plaintiff's continued smoking undermined his claims.  (Tr. 70.)  Moreover, with respect to the medical evidence relevant to this issue, the ALJ highlighted Dr. Houk's treatment note, which observed that the plaintiff had not sought medical treatment but was instead seeking help establishing a disability claim – something the physician expressly noted was "odd".  (Tr. 71, 564.)  Additionally, the physicians treating the plaintiff found his chest pain to be "atypical", and the medical notes taken after he presented with a heart attack confirm this, since subsequent tests showed that his condition had become normalized.  (Tr. 70, 582-83, 960, 993, 1015, 10929, 1095, 1113.) As additional support for her finding that the plaintiff's subjective complaints about the severity of his condition were overstated, the ALJ noted that the plaintiff's COPD and asthma were reportedly controlled with medication, and this is supported in the record.  (Tr. 70, 562, 663, 993, 1067, 1113.)

The plaintiff's specific claims of error with respect to the ALJ's evaluation of the medical evidence is also both narrow and unpersuasive.  Thus, the plaintiff complains that the ALJ failed to recognize, evaluate or credit evidence in the record that could have supported the plaintiff's claim that he experiences neck and lower back pain.  The plaintiff claims that the ALJ ignored evidence from 2001 –

approximately eight years before the alleged onset of disability – showing that he had a moderate bulge at the L4/5 level with effacement of the anterior thecal sac indicating lower back pain with radiculopathy. Additionally, the plaintiff claims that the ALJ failed to properly assess the plaintiff's claims of substantial limitations on his daily activities, and failed to sufficiently evaluate medical records that he submitted from his time in prison in Massachusetts. In effect, however, the plaintiff is asking this Court to embrace the plaintiff's subjective claims regarding his sleep habits and other physical limitations, which the ALJ did address by evaluating medical evidence of record that frequently did not substantiate the plaintiff's subjective complaints. Moreover, with respect to medical records from the plaintiff's lengthy incarceration, we agree with the Commissioner that find that those records substantially predate the alleged onset date in this case, and thus appear to be of especially limited relevance to the plaintiff's actual claims in this case. See Johnson v. Comm'r, 529 F.3d 198, 204 (3d Cir. 2008) (although ALJ may not ignore or reject pertinent evidence without an explanation, an ALJ may overlook other evidence, including medical records, that is either impertinent or not probative of the disability claimed).

We disagree with the plaintiff's assertion that the ALJ failed properly to evaluate his subjective complaints of pain, or failed adequately to consider the

relevant medical evidence submitted.  The ALJ's decision shows that she did consider

the relevant medical evidence, and in a number of specific instances she explained

why she concluded that the evidence did not substantiate the plaintiff's subjective

complaints.  Accordingly, we find no error in the ALJ's finding that the plaintiff's

subjective complaints were only partially credible, and we do not find that the ALJ

erred with respect to her consideration of the medical evidence of record.[5]

## C.   The ALJ Properly Evaluated Medical Source Opinions

Next, the plaintiff argues that the ALJ failed to give appropriate weight to the

opinion of Veronica Seitzsinger, a licensed social worker, who opined that the

plaintiff experienced PTSD symptoms related his time in prison.  (Doc. 9, at 7.)  The

entirety of the plaintiff's argument is contained in the following sentence:  "Mr.

Prasnikar's counselor, Veronica S. Seitzsinger, MSW, LSW, at Child and Family

---

[5]  Although the plaintiff's brief reflects zealous advocacy regarding his claimed disabling physical and mental conditions, we must emphasize that the brief is in many respects little more than a summation of the plaintiff's own subjective testimony and claims, and it devotes considerably less focus to highlighting objective medical evidence in the record that the ALJ ostensibly failed to consider.  (Doc. 9, at 5-6.)  The plaintiff plainly takes substantial issue with the ALJ's failure to fully accept or embrace the extent of his claimed limitations, or the effects of his various physical ailments upon his ability to function and to work.  However, the ALJ did evaluate the extent of the plaintiff's claims, and did so in the context of a medical record that in many instances did not fully support the plaintiff's claims.  The ALJ was empowered to make this evaluation of the evidence, and her decision recited the reasons for her assessment of the plaintiff's credibility.

Support Services provided a summary of the plaintiff's treatment dated October 17, 2011 wherein she explained how the plaintiff's incarceration causes him to now be diagnosed with post traumatic stress disorder which impacts him on several levels[.]" (Id.)  To the extent the plaintiff is asserting an argument regarding Ms. Seitzsinger's opinion, and the ALJ's consideration of it, we interpret this sentence to mean that the plaintiff contends that the ALJ failed to adequately evaluate Ms. Seitzsinger's summary of the plaintiff's mental health.  If this is indeed the plaintiff's argument, it is without merit because the ALJ had no obligation to accept the opinion of Ms. Seitzsinger, since she is not considered to be an acceptable medical source under applicable regulations and social security rulings.  Moreover, the plaintiff fails to explain how the ALJ's treatment of this aspect of the record resulted either in error, or compels remand for further consideration.

As the Commissioner rightly observes, and ALJ has no obligation to adopt the opinion of a non-medical source.  SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006).  Licensed social workers are not "acceptable medical sources" under the governing regulations.  20 C.F.R. § 416.913(a); SSR 06-03p, 2006 WL 2329939, at *2.  Accordingly, information that Ms. Seitzsinger supplied as a licensed social worker, no matter how probative it may have been, is not capable of establishing the existence of a medically determinable impairment.  Id.  Moreover, we agree with the

Commissioner that the plaintiff has not explained how the ALJ's failure to consider this evidence was harmful, and he does not explain how consideration of this non-treating source would have led to a different result.  Indeed, the ALJ did recognize and address the plaintiff's mental health treatment in the context of discussing other medical evidence from other medical sources, as well as the plaintiff's own testimony.  Accordingly, it is clear from the ALJ's opinion that she was aware of the plaintiff's mental health symptoms, his subjective claims regarding them, and the testimony of other medical sources.  Any failure to address the opinion or treatment summary from a non-acceptable medical source is, at best, harmless and does not compel remand to the Commissioner for further consideration.  See, e.g., Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").  In this case, we do not find that remand would serve any purpose, as Ms. Seitzsinger was a non-acceptable medical source, and her treatment note, even if considered, would not be capable of leading to a different outcome in the ALJ's opinion.

## D.   The ALJ Properly Found that the Plaintiff Did Not Meet Listing 12.06

In his third argument, the plaintiff contends that he satisfied Social Security listing 12.06 for anxiety-related disorders, but as the Commissioner notes, the plaintiff provides no evidence in support of this claim. (Doc. 9, at 7.) We find that the ALJ adequately addressed this issue at step 3 of the sequential claim analysis process, and sufficiently explained her reasons for finding that the plaintiff did not meet the listing.

At the third step of the sequential evaluation, a claimant will be found disabled where he is found to have an impairment or combination of impairments that meets or equals the criteria for a listing that is set forth in Appendix 1 of the Social Security Regulations, and meets the duration requirement with respect to the listing. 20 C.F.R. 416.924(d). It is well-established that in order to meet a listing, a claimant must satisfy all of the specified medical criteria with respect to a claimed impairment. "An impairment that manifests only some of those criteria, no matter how severe, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 525 (1990).

In order to satisfy the requirements of Listing 12.06, a claimant's medical impairments must result in at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning;

marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06.

The plaintiff argues that he had marked restrictions in his activities of daily living and marked difficulties in maintaining social functioning that combined to result in a complete inability to function outside of his home.  However, his assertions – which are really his own conclusions – are not supported by citation to evidence compelling such a finding.  Furthermore, review of the ALJ's decision makes clear that this issue was considered adequately, and that the ALJ simply found that the plaintiff failed to meet this listing.  (Tr. 67-68.)  In her opinion, the ALJ expressly stated that she had considered Listing 12.06, but in her review of the evidence and the plaintiff's own testimony, concluded that the plaintiff had only mild restrictions on his activities of daily living, and had moderate – not marked – difficulty with respect to social functioning.  (Tr. 67-68.)

In support of her conclusion, the ALJ highlighted that the plaintiff testified that he prepares his own meals, performs household chores, and does some shopping.  (Tr. 31-32, 67, 181-82.)  The ALJ noted that the plaintiff lives with his girlfriend, and appears to get along with his treatment providers.  (Tr. 17, 68.)  This evidence was bolstered by the opinion of Dr. Garito, the state agency consultative psychologist,

who observed that the plaintiff was able to engage in activities of daily living, cook, drive, and manage finances.  (Tr. 72, 625.)  Although he also found the plaintiff's social activity to be limited, he also noted that the plaintiff was able to relate to family and to other individuals socially.  (Tr. 72, 625.)  On the basis of his review, Dr. Garito concluded that the plaintiff had mild restrictions on his activities of daily living and moderate difficulty in social functioning.  (Tr. 72, 625.)  This evidence sufficiently supported the ALJ's conclusion that the plaintiff did not meet Listing 12.06.

## E.   The ALJ Considered the Plaintiff's Medical Regimen

Next, the plaintiff contends that the ALJ failed to adequately consider the medications that the plaintiff took to manage his various conditions.  (Doc. 9, at 8.) However, not only does the plaintiff fail to explain how the ALJ's handling of this issue compels a remand in this case, but this argument ignores the unassailable fact that the ALJ did address the plaintiff's relevant medical records, which expressly included information relating to the plaintiff's various medications.  In this regard, the ALJ noted that the plaintiff was taking medication for his cardiac condition, and addressed the plaintiff's claims that this medication had certain side effects, including fatigue and some intestinal discomfort.  (Tr. 69.)  Likewise, the ALJ observed that the plaintiff took medication that was successful in controlling his COPD, and also that the plaintiff had previously taken Flovent and Prednisone, but had since discontinued

their use.  (Tr. 70.)   We thus agree with the Commissioner that the plaintiff's argument is factually wrong – the ALJ did consider the plaintiff's medical regimen – and we further do not perceive how her treatment of this aspect of the record was deficient in any respect.  It appears that the plaintiff simply disagrees with the way in which the ALJ weighed this evidence; he does not explain how her evaluation of this evidence was erroneous, or how it should have compelled a different outcome. We find no error with the ALJ's treatment of this issue.

### F.   The ALJ Properly Explained and Supported Her Determination of the Plaintiff's RFC

Lastly, the plaintiff argues that the ALJ erred in her assessment of his residual functional capacity when she concluded that he had the ability to perform a range of light work with certain noted limitations.  In making this argument, the plaintiff again urges this Court to find that his own subjective testimony established that he was entirely disabled, and unable to engage in any work, even limited light work.  As noted above, however, we find that the ALJ adequately explained her assessment of the plaintiff's own subjective testimony in the context of the entire medical record submitted in this case, and the resulting RFC assessment accounted for the plaintiff's impairments that were credibly established.

A claimant's RFC represents an assessment of the most that the claimant can do despite limitations resulting from his recognized impairments. 20 C.F. R. § 416.945; SSR 96-8p, 1996 WL 374184 (S.S.A. 1996). Our review of the ALJ's assessment of the plaintiff's residual functional capacity is a deferential standard, and the assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002). In making an RFC assessment, the ALJ is required to evaluate all relevant evidence, Fargnoli v. Massanari, 247 F.3d 34, 40-41 (3d Cir. 2001), and explain her reasons for rejecting any such evidence, Burnett v. Commissioner of Social Security Administration, 220 F.3d 112, 122 (3d Cir. 2000). Additionally, the ALJ must give a claimant's subjective complaints "serious consideration," Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993), and to make specific findings of fact, including credibility, as to a claimant's residual functional capacity. Burnett, 220 F.3d at 120; see also Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Our review of the record in this case compels us to find that the ALJ complied with these legal requirements, and her decision regarding the plaintiff's RFC was supported by substantial evidence.

In this case, the ALJ determined that the plaintiff retained the RFC to perform a range of light work, subject to various restrictions that were presented to the VE at the hearing. (Tr. 52-54, 68.) In her decision finding that the plaintiff had the ability

to engage in some light work, the ALJ referred to a number of pieces of evidence and testimony.  Thus, the ALJ observed that since presenting at Lehigh Valley Hospital with what was diagnosed to be a heart attack, the plaintiff had sought only limited medical attention and follow-up care, which was conservative.  (Tr. 70.)  The ALJ also emphasized that objective medical evidence developed after the plaintiff's cardiac event in October 2009 reflected that the plaintiff's condition had normalized. Thus, the ALJ highlighted the fact that in a February 2011 stress test, the plaintiff was found to be functioning normally, and physicians observed that the chest pain the plaintiff reported was "atypical".  (Tr. 70, 583, 1029.)  With respect to the plaintiff's COPD, the ALJ noted evidence showing that the plaintiff's symptoms were controlled by medication and were aggravated by factors such as his continued smoking despite repeated warnings against it, and environmental factors like humidity, which was accounted for in the limitations that the ALJ assigned to the plaintiff's RFC.  (Tr. 70, 993, 1113.)  In her consideration of the plaintiff's mental health limitations, she found that he retained adequate insight and reasonable judgment notwithstanding his depression.  (Tr. 71, 646.)  The ALJ noted that the plaintiff's mood had been appropriate, his insight and judgment good, and he was fully oriented in May 2011.

In addition, the ALJ placed some reliance upon the opinions of the state agency reviewing physicians, Drs. Legaspi and Garito.  (Tr. 72.)  Dr. Legaspi's opinion

corroborated the ALJ's ultimate conclusion with respect to the plaintiff's RFC, as she found that the plaintiff was capable of performing light work.  Likewise, Dr. Garito found that despite some mental limitations, the plaintiff was capable of satisfying the basic mental demands presented by competitive work.  (Tr. 625, 663.)

In attacking the ALJ's RFC assessment, the plaintiff does little to identify any errors with her evaluation of the evidence, other than to suggest that his own testimony should have been credited more fully, especially with respect to his claims that he lacks energy and needs frequent breaks to rest.  (Doc. 9, at 8-9.)  As we have outlined, however, the ALJ's RFC assessment was supported by substantial countervailing evidence that was sufficient to support the conclusion that the plaintiff, while suffering some mental and physical limitations, retains the ability to engage in a range of light work with certain limitations.  Because the plaintiff offers little in the way of specific criticisms of the ALJ's decision, and because that decision was amply supported with evidence in the record, we find no error and no basis to remand this matter to the Commissioner for further consideration of this issue.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, upon consideration of the parties' briefs and the entire record of the administrative proceedings in this matter, and finding that the ALJ's decision to deny the plaintiff's claim for SSI benefits was supported by

substantial evidence, the plaintiff's claims in this action will be denied.  A separate

order will issue.

*/s MARTIN C. CARLSON*
Martin C. Carlson
United States Magistrate Judge

September 24, 2014